**Paul B. GIRMA, Plaintiff,**

v.

**SKIDMORE COLLEGE, Defendant.**

No. 00–CV–0958.

United States District Court, N.D. New York.

Nov. 7, 2001.

---

**DECISION & ORDER**

MCAVOY, District Judge.

Plaintiff Paul B. Girma ("Girma" or "Plaintiff"), an African–America male of Ethiopian national origin born in 1951, commenced the instant litigation pursuant to Title VII of the Civil rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et. seq.*, the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. § 621, and the New York State Human Rights Law, N.Y. Exec. Law § 296 *et. seq.* ("NYHRL") alleging that he was denied reappointment as an assistant professor at Skidmore College ("Skidmore" or "the College" or "Defendant") based upon his race, national origin, and age. Presently before the Court is Defendant's Motion for Summary Judgment pursuant to FED. R. CIV. P. 56 seeking dismissal of the complaint in its entirety.

## I. BACKGROUND

Inasmuch as this is a motion for summary judgment by Defendant, the following facts are presented in the light most favorable to Plaintiff. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir. 1999). The majority of these facts are taken from the parties' Local Rule 7.1 Statements.

In the Fall of 1996, Plaintiff was hired by Skidmore in a tenure track teaching position in the Defendant's Department of Business ("DOB"). Girma, who holds a Ph.D. in finance, taught courses at Skidmore in investment, finance, and introduction to business. Girma's initial contract was for three years, ending after the Spring of 1999 semester.

Skidmore has an established procedure whereby tenure track professors are evaluated to determine whether the College will extend an offer for a second three-year contract (referred to by the parties as "reappointment"). The evaluation procedure allows the faculty of the department in which the candidate teaches, during the candidate's second year, to submit comments to the department's Personnel Committee on whether the candidate should be considered for reappointment the following year (the third year). In this case, it was the consensus of the DOB faculty that Girma should stand for review in his third year (the Fall of 1998). These faculty comments were very favorable of Girma's chances for reappointment.

Unsuccessful candidates for reappointment are advised of the College's determination and generally offered a one year

"termination contract" without the prospect of continuing employment. Although not directly relevant to this case, the College also has a procedure to evaluate professors who are granted reappointment to determine whether the College will offer them tenure. This usually occurs in a professor's fifth year.

Skidmore's procedure for reappointment is set forth in the College's Faculty Handbook[1] and uses a criteria which evaluates performance in three categories: teaching excellence, scholarship, and service to the college community. The Faculty Handbook indicates that teaching ability is the most important criterion for reappointment.

The reappointment procedure allows each department's personnel committee to conduct this evaluation using the stated criteria (discussed more fully below). The personnel committee then reports its recommendation to the department chairperson, stating its reasons therefore, and providing to the chairperson the materials upon which the committee based its recommendation. The department chairperson considers the same material as the personnel committee, formulates his/her own recommendation, and then forwards both recommendations (and any attendant materials) to the Dean of Faculty. The Dean of Faculty, in turn, reviews the material and makes his/her own recommendation to the College President who makes the final decision whether to grant reappointment. Here, the DOB Personnel Committee consisted of Associate Professors Betty V. Balevic, Martin J. Canavan,

and Mary E. Correa. Professor Roy Rotheim was the DOB Chair, Susan Bender was Acting Dean of Faculty, and Phyllis Roth was Interim President.

In the Fall of 1998, the Department of Business considered the reappointment of three candidates: Girma, Eric Lewis, and James Kennelly. At least one other professor from the department, Gary McClure, was considered for tenure (which is determined by a interdepartmental tenure committee with faculty comment taken from the DOB faculty and chairperson). Kennelly is approximately the same age as Plaintiff. McClure was in his mid–60s in 1998. Lewis, Kennelly, and McClure are Caucasian.

In conducting the evaluations for reappointment, the personnel committees of each department in the College rely upon, *inter alia*, student evaluations of the candidate. These student evaluations are reported in a "long form evaluation" and a "short form evaluation." Both of these evaluations (long form/short form) are taken from a form completed by the students themselves. On the front of this form the students give the faculty member a rating from "excellent" to "poor" on separate aspects of the professor's teaching performance (*e.g.*, preparation for class, mastery of material, etc.). On the back of this same form, students are allowed to give a longer narrative commentary on certain aspects of the class (such as positive and negative aspects of the course, whether the writer would recommend the class to friend, etc.). The ratings that are report-

---

1. In this case, it appears that the reappointment procedure was revised in 1998. Defendant afforded Plaintiff the opportunity to be evaluated under the previous procedure (last amended in 1995) or the new procedure (1998). Plaintiff elected for the previous procedure. There appears to be no difference in the criteria for selection under the two, but rather differences concern who can write in support or opposition of the candidate, and whether outside review is required on the issue of scholarship. Except as indicated in the text, there is no genuine or material dispute arising from the fact that the College used the 1995 procedure.

ed on the front of the form are tabulated by the College using numerical equivalents for the rankings, giving the professor a score from 1.0 (poor) to 5.0 (excellent) in each area. The scores in each class are combined and averaged for a class score; class scores can be averaged for a semester score; and semester scores can be averaged for an overall score. These scores are referred to as the "short form" evaluations and the narrative as the "long form" evaluations. Skidmore considers an overall short form score below 4.0 to be below its requirement for reappointment.

At the time of Girma's consideration for reappointment, the DOB Personnel Committee had access to Girma's short and long form evaluations from the Fall of 1996 through the Fall of 1998 semesters. Apparently because the long forms are handwritten which could identify the authors, each faculty member is provided with the evaluations after the professor submits student grades for each semester. In the Fall of 1998, in order to facilitate a timely determination by the DOB Personnel Committee, that committee asked the candidates to sign a release allowing the committee to access the evaluations before the grades were submitted (and, therefore, before the candidates saw the evaluations). Girma agreed and signed this release.

The majority of Girma's short form scores while he was at Skidmore were below 4.0, with some significantly below this level. The long form evaluations were somewhat mixed with the majority of the students expressing both frustration and negativity with Girma's teaching style citing his inability to support the students' needs and respond adequately to their questions during classes. Few of the students indicated they would recommend Plaintiff's classes to their friends.

During Girma's second year, he was counseled by Professor Rotheim regarding the importance of his short form scores and was advised of the impact these scores would have on his eventual bid for reappointment. Overall, Plaintiff's short form scores demonstrated an improvement during the Spring of 1998 semester from the dismally low initial scores he received when he first arrived at Skidmore. When Plaintiff's short form scores showed this improvement, professors in the department, including Professor Balvic, expressed optimism that he was on upward trend in this area which would positively effect his bid for reappointment. Unfortunately, Girma's Fall of 1998 semester short form scores indicated a dip back to the below-par range. This, in turn, caused many professors, including Professor Balvic, to lose confidence that Girma could meet Skidmore's teaching expectations. As indicated below, these scores (as well as the long form evaluations) played a decisive role in each recommendation.

Through the evaluation procedure, the DOB Personnel Committee also solicited and received faculty letters commenting on Girma's reappointment, some of which remarked favorably on his teaching ability and virtually all of which remarked favorably on his intellect and scholarship. Despite Girma's contention to the contrary, the procedure in effect did not require Defendant to obtain recommendations from all eligible professors nor did it require the relevant recommenders (DOB Personnel Committee, Chairperson, Dean of Faculty) to make a recommendation based upon a majority vote of the department faculty. Rather, faculty comment was one of the several modes of input into the process but the procedure clearly allowed each recommender to place primary emphasis on teaching ability as reflected by the student evaluations. Consequently, when faced by poor teaching evaluation the committee could vote against reap-

pointment even if a majority (or even all) of the faculty members supported the opposite result.

Here, that was the case. The DOB Personnel Committee unanimously recommended that Girma not be reappointed. In reaching this conclusion, the Personnel Committee cited a "very mixed record across the areas of teaching, scholarship and community service" but concluded that despite "some real strengths, his weakness in teaching (teaching being a principal criterion for continued service at Skidmore), make us unable to recommend him for reappointment." DOB Personnel Committee recommendation to Prof. Rotheim, December 14, 1998.

In a relatively lengthy recommendation letter to Acting Dean of Faculty Bender dated January 5, 1999, Professor Rotheim reviewed: (a) the procedure employed by the DOB Personnel Committee, (b) the DOB Personnel Committee's recommendation, (c) Girma's teaching abilities as reflected by the students in the long and short form evaluations, and (c) the efforts made to assist Girma in improving his teaching skills. Rotheim reluctantly and apologetically concurred in the Personnel Committee's recommendation not to offer reappointment, concluding:

> So at the end of the day, I find it is impossible to recommend Professor Paul Girma for another 3–year appointment in the College. He is an extremely promising scholar, but his classroom performance ... is causing students distress and, from what I can tell by reading his evaluations, is causing them to learn less than might be the case had they had a different classroom experience. As such, and despite his knowledgeability [sic] in his field and the high standards and expectations which imbue his courses, the Department of Business

is forced to recommend ... that [he] not be reappointed in the College.

> I would like to add that I personally find the task of conveying this negative recommendation quite regrettable and saddening. I have come to know Paul Girma well these last three years ... and have grown to admire and respect him as a colleague and a scholar. From a personal perspective, I am very sorry this appointment is not working out.

Rotheim recommendation to Bender, Jan. 5, 1999.

Acting Dean Bender concurred with the Personnel Committee's and the Chairperson's recommendations, and, also relying strongly on Girma's poor teaching evaluations, recommended against reappointment. The College's Interim President accepted these recommendations and, on February 26, 1999, Girma was notified that his candidacy for a second three-year term was unsuccessful and that his employment would terminate after the 1999–2000 academic year. Professors Kennelly and Lewis were reappointed. Professor McClure was granted tenure. On August 12, 1999, Dr. Girma submitted his letter of resignation, effective September 1, 1999. This litigation ensued thereafter.

## II. DISCUSSION

### a. Summary Judgement

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999), *cert. denied*, 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

The Second Circuit recently cautioned that on a motion for summary judgment, "especially in the context of a claim of discrimination, the court should not view the record in piecemeal fashion." *Fitzgerald v. Henderson*, 251 F.3d 345, 360 (2d Cir.2001). The Court is also mindful that where the intent of one party is in question, as is often the case with employment discrimination claims, the "court must be cautious about granting summary judgment." *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). However, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001).

"Even where facts are disputed, in order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, (2d Cir.2001). The "non-moving party may not rely on conclusory allegations or unsubstantiated speculation." · *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Consequently, summary judgment, even in a discrimination case, is granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000)(the Supreme Court "reiterated that trial courts should not 'treat discrimination differently from other ultimate questions

of fact.' ")(quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

With this standard in mind, the Court turns to the arguments raised by the parties.

### b. "Single Motive" or "Dual Motive" case?

Defendant argues, as discussed below, that Plaintiff cannot establish a *prima facie* case of race, national origin, or age discrimination under the shifting burden standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny, and, that even if he can, he cannot establish that the employer's legitimate nondiscriminatory reasons for the employment decision are a pre-text for discrimination. Plaintiff responds by arguing that this is not a case to be analyzed under *McDonnell Douglas Corp. v. Green*, but rather a dual motive case to be analyzed under the standard set forth by *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)(plurality opinion), and its progeny. *See Rose v. NYC Bd. of Educ.*, 257 F.3d 156, 161 (2d Cir.2001)(the *Price Waterhouse* framework applies to cases under the ADEA also). Plaintiff argues that under the latter standard, the burden is on the defendant to establish that it would have taken the same action in the absence of discriminatory motives.

▮ As the Second Circuit recognized in *Bickerstaff v. Vassar College*, 196 F.3d 435, 445–46 (2d Cir.1999):

Title VII suits fall into two basic categories: "single issue motivation" and "dual issue motivation" cases. In single issue motivation cases, the single issue [is] whether an impermissible reason motivated the adverse action, under the framework first set forth in *McDonnell*

*Douglas Corp. v. Green.* In dual issue motivation cases, the determination involves both the issue of whether the plaintiff has proved that an impermissible reason motivated the adverse action and the additional issue of whether the defendant has proved that it would have taken the same action for a permissible reason which is analyzed under the framework set forth in *Price Waterhouse v. Hopkins.*

*Id.* (internal quotations and citations omitted).

█ A dual motive case generally arises when policy documents or evidence of statements or actions by decision makers exist that may be viewed as directly reflecting the alleged discriminatory attitude, i.e., a "smoking gun." *Id.* at 446 (internal quotations and citations omitted). Here, Plaintiff asserts that this direct evidence of discrimination by decision makers arises from four sets of circumstances.

█ The first set of circumstances is a contention that during the course of three conversations which Plaintiff had with Professor Rotheim, Rotheim inquired about the ages of Girma and his wife. Girma provides no further details regarding the content of these conversations other than to conclude that he (Girma) was "struck by the fact that ...Professor Rotheim seemed to want to know not only my age, but the age of my spouse." Rotheim indicates in his reply affidavit that the only conceivable situation that he might have asked Girma for his and his wife's ages was in the context of a conversation, initiated by Girma, about a personal problem which Girma and his wife were experiencing in starting a family. Rotheim asserts, without contradiction, that "to the extent that such an inquiry could have occurred, it was done as a sympathetic friend who was trying to lend support and counsel. I certainly never made any such inquiry in

the content of determining whether Professor Girma should continue to be a member of the Skidmore faculty." Rotheim Reply Aff. ¶ 7.

Drawing all inferences in Plaintiff's favor, this statement is hardly an indication of discriminatory motive related to an employment decision let alone a "smoking gun." There is no connection between the statement and any employment action taken by Rotheim or even that Rotheim held any animus against workers within a protected classification.

█ The second set of circumstances are statements attributed to Rotheim by Jeannette Oppedisano, a former professor at Skidmore, who asserts that:

in a faculty meeting on September 10, 1997, Professor Rotheim stated that an applicant for a faculty position was too old (he was 45). On several occasions in the Fall of 1997, he commented about the fact that Professor Gary McClure, who was ultimately granted tenure, was '64' (he was actually 62).

Oppedisano Aff. ¶ 18.

Prof. Oppedisano goes on to conclude that, in her opinion, Rotheim "had a problem with older people" and a "preoccupation with the age of his professional colleagues." *Id.* at ¶¶ 19, 20. Prof. Rotheim denies making the statement regarding the forty-five year old candidate and indicates that at the time this individual was being considered for employment he and several other under-forty candidates made presentations to the department. None of the candidates were hired, by unanimous determination of the department faculty, because of the poor quality of each candidate's presentation. With regard to Professor McClure, Prof. Rotheim indicates that he did at one time comment positively on McClure's age, indicating that he thought it was wonderful that McClure

entered into a second career in academia. Rotheim notes also that he supported McClure's quest for tenure which was granted the same year that Girma's reappointment was declined.

Assuming for purposes of this motion that both statements were made, they likewise do not amount to the proverbial smoking gun. Neither involved Girma and neither involved a decision whether to renew a contract which is in issue here. In fact, as attested by Prof. Oppedisano, Professor McClure, who was older than Plaintiff, was granted tenure, a more secure position than the three-year reappointment which Plaintiff sought. The affiant's opinion as to the impact of such statements are of no evidentiary value to the decision on this motion. *See Bickerstaff*, 196 F.3d at 452 (disregarding conclusory allegations of race-based bias).

■ The third set of circumstances from which Plaintiff attempts to demonstrate a smoking gun, this time on the issue of race, arise from the circumstances surrounding his initial hiring. In this regard, Prof. Oppedisano attests that in 1992 when Girma first applied for a position with the college, "Professor Canavan had told me that he and another member of the Business Department ... met with Dr. Girma at an external location and only interviewed him because I had recommended him, but did not consider his application further." Oppedisano Aff. ¶ 22. Oppedisano then asserts that in 1995, when a new position became available, she encouraged Girma to apply and "let Professor Canavan know that the application would be forthcoming." Oppedisano Aff. ¶ 21. Girma

was not chosen to interview for the position but, supposedly when the selected-candidate declined the offer, "Professor Canavan, the chair of the department, told me that our department was going to lose the line so he was going to propose Dr. Girma because the Dean of the Faculty, Phyllis Roth, was not likely to refuse to hire a minority candidate." *Id.* ¶ 24.[2]

Even assuming this occurred, it indicates only that race played a role in Girma's initial hiring, not in the decision whether to offer him a second three-year contract. While these circumstances may have some value in developing a circumstantial case of discrimination (as may the other circumstances mentioned here), they are hardly a smoking gun.

■ Finally, Plaintiff asserts that during his second year with the College, Prof. Rotheim asked to speak to him regarding his poor student evaluations and the impact that such evaluations would have on reappointment. Apparently, Rotheim met with Prof. Girma at the student cafeteria and the two spoke about Girma's poor reception by the student body while the two had coffee. Plaintiff asserts, in wholly conclusory fashion, that he believes Rotheim intentionally "breached the confidentiality of personnel evaluations" in the student cafeteria "to provoke a reaction from me in a public forum." Prof. Girma further asserts that "I believe that Professor Rotheim would not have similarly embarrassed Caucasian professors."

There is no evidence indicating that anyone other than Girma and Rotheim

---

**2.** Prof. Oppedisano concludes this remark with the following sentence: "This was because Skidmore has historically hired few, if any, African American faculty." While statistical evidence of discrimination may give rise to circumstantial and, in some situations, direct evidence of discrimination, here the de-

clarant offers no statistical support for her conclusion. Inasmuch as this statement is clearly an opinion drawn by the declarant, it is of no probative value to the Court's decision with regard to whether there is evidence of direct discrimination. *See Bickerstaff*, 196 F.3d at 448–450, 452.

heard the content of the conversation, nor is there any indication that the content of the conversation or its setting supports an inference that Rotheim harbored any racial or ethnic animus against Plaintiff (or anyone else). Despite Plaintiff's subjective beliefs about this encounter, it is not evidence of direct discrimination. *Bickerstaff,* 196 F.3d at 456 ("Bickerstaff's feelings and perceptions of being discriminated against are not evidence of discrimination.") (quotation and citation omitted).

In *Rose,* the Circuit reviewed a district court's decision in an ADEA case not to give a *Price Waterhouse* shifting burden charge requested only by the plaintiff despite evidence that the plaintiff's supervisor told her that he intended to find someone "younger and cheaper." *Rose,* 257 F.3d at 161. The Circuit held that given this direct evidence of discriminatory intent, it was error for the district court not to charge under *Price Waterhouse. Id.* In reaching its decision, the Circuit noted as follows:

> The *Price Waterhouse* issue does not arise for the trier of fact until the plaintiff has carried the burden of persuading the trier that the forbidden animus was a motivating factor in the employment decision but has failed to persuade the trier that non-discriminatory reasons proffered by the employer were pretexts and not also motivating factors. Once the presentation of evidence is sufficient to create this possibility, the employer has the option of defending on the *Price Waterhouse* ground that it would have made the same decision even in the absence of a discriminatory motive. Price Waterhouse is thus a defense. However, for tactical reasons, it is often only the plaintiff who asks for a *Price Waterhouse* instruction . . . .

*Rose,* at 161 (internal quotations and citations omitted).

Here, the Court does not find direct evidence of discrimination sufficient to employ *Price Waterhouse,* and, inasmuch as the defendant has not argued for that standard, will apply the *McDonnell Douglas Corp. v. Green* burden-shifting analysis on this motion. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 91 (2d Cir.2001)(McDonnell Douglas shifting burden analysis applies on ADEA claims); *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 913 (2d Cir. 1997)(age discrimination claims brought under NYSHRL analyzed similarly to federal claims).

#### c. McDonnell Douglas Burden–Shifting Analysis

Under the *McDonnell Douglas Corp. v. Green* analysis, a plaintiff must first establish a *prima facie* case of race, national origin, and/or age discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the plaintiff makes out a *prima facie* case, the burden of production shifts to the employer to rebut this presumption by articulating a legitimate, nondiscriminatory reason for its actions. *Fisher v. Vassar College,* 114 F.3d 1332, 1335–36 (2d Cir.1997)(*en banc*)("*Fisher III*"), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

If the employer proffers a legitimate, nondiscriminatory reason for the challenged employment action, "the presumption raised by the *prima facie* case is rebutted, and drops from the case." *St. Mary's Honor Ctr.,* 509 U.S. at 507, 113 S.Ct. 2742; *see also Ternullo v. Reno,* 8 F.Supp.2d 186, 190 (N.D.N.Y.1998). The

burden then shifts back to the plaintiff who "then has the opportunity to demonstrate 'that the proffered reason was not the true reason for the employment decision,' and that race [national origin or age] was." *Fisher III*, 114 F.3d at 1336 (quoting *St. Mary's*, 509 U.S. at 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407).

The ultimate burden of persuasion remains always with the plaintiff. *St. Mary's*, 509 U.S. at 507, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407. In determining whether the plaintiff can satisfy this ultimate burden, a court must examine the entire record and apply "a case-by-case approach." *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir.2000).

### d. Prima Facie Case

■ To establish a *prima facie* case of intentional discrimination, Plaintiff must establish four elements. These are: (1) that he is a member of a protected class; (2) that he is qualified to hold the position; (3) that he suffered an adverse employment action; and (4) that the adverse employment action took place under circumstances that give rise to an inference of unlawful discrimination. *Stern v. Trustees of Columbia University*, 131 F.3d 305, 311–12 (2d Cir.1997) (citing *Burdine*, 450 U.S. at 253 n. 6, 101 S.Ct. 1089); *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 91 (2d Cir.2001)(same for ADEA claims).

■ The burden of proof that a plaintiff must meet at the *prima facie* stage in order to survive summary judgment is "minimal" or *de minimis*. *St. Mary's*, 113 S.Ct. at 2746–47; *Fisher III*, 114 F.3d at 1336. The Second Circuit has indicated that in determining whether a plaintiff has established a *prima facie* case, a court should consider only the plaintiff's evidence. *Graham v. Long Island Rail Road*, 230 F.3d 34, 42 (2d Cir.2000).

Nonetheless, a plaintiff must proffer some admissible evidence of each of the four elements, including evidence from which a reasonable trier of fact could infer discriminatory motive. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir.1995).

### 1). Member of a protected class

Defendant does not debate that Plaintiff is within the protected classifications of race, national origin, and age. Therefore, the Court assumes, without deciding, that Plaintiff satisfies this prong of the *prima facie* case on each claim.

### 2). Qualified to hold the position

■ Defendant asserts, however, that Plaintiff cannot satisfy the second prong of the *prima facie* case on his claims because he cannot demonstrate that he was qualified for reappointment. In this regard, Defendant argues that the primary criterion for reappointment is teaching qualification and, given the objectively clear evidence of declining teaching performance by Girma, he failed to meet the criteria for reappointment set by the College.

■ This argument places too high a burden on Plaintiff at the *prima facie* stage. While this same argument is relevant and will be addressed with respect to whether Plaintiff can establish that the employer's reason for the employment action is a pretext for discrimination, at the *prima facie* stage a plaintiff must show only that he "possesses the basic skills necessary for performance of [the] job." *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir.1991) (internal quotation marks omitted). As the Circuit recently held:

[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer. The

qualification prong must not, however, be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision. As we have repeatedly held, the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal. *Slattery,* 248 F.3d at 91.

Here, inasmuch as Plaintiff was at least minimally qualified to perform the essential duties of the position and did so for three years, he meets this requirement at this stage.

#### 3). Adverse employment action

Further, there is no dispute that the failure to offer Plaintiff a three-year extension contract was an adverse employment action and therefore the Court assumes without deciding that this prong is in Plaintiff's favor on each claim.

#### 4). Adverse employment action took place under circumstances that give rise to an inference of unlawful discrimination.

 Defendant also argues that Plaintiff cannot present facts to satisfy the fourth prong of the *prima facie* case, that is, that the adverse employment action took place under circumstances that give rise to an inference of unlawful discrimination. "A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham,* 230 F.3d at 39; *see Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95 (2d Cir.1999) (inference of discrimination arises when individual of one race treated less favorably than those of another race who are similarly situated).

A plaintiff may also attempt to establish a *prima facie* case of discrimination by presenting evidence of various other indicia of discriminatory intent including, but not limited to:

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

*Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (citations omitted).

Because the plaintiff brings claims based upon theories of discrimination on separate protected classifications, the Court will analyze each separately.

#### a. Age Discrimination

 As discussed above, with regard to discrimination on the basis of age, Plaintiff cites to the supposed statements of Professor Rotheim: (a) inquiring of the Plaintiff's and Plaintiff's wife's ages, (b) making a statement about the age of another professor-candidate, and (c) making a statement about Professor McClure's age. The Second Circuit has held that "stray remarks" of a decision maker, without a more definite connection to the employment decision, are insufficient to prove a claim of employment discrimination. *See Woroski v. Nashua Corp.,* 31 F.3d 105, 109–110 (2d Cir.1994). Here, there are questions whether Rotheim was the decision maker and whether, in the context of this case where there is evidence that Rotheim supported the reappointment and tenure of other professors who were within

this protected classification, a finder of fact could draw the logical conclusion that an inference of age discrimination exists. *Bickerstaff*, 196 F.3d at 448.[3] However, in *Graham*, the Circuit held that the district court erred when it considered the defendant's uncontradicted evidence in determining whether the plaintiff had established a prima facie case. *Graham*, 230 F.3d at 42 ("[S]ince the burden at this stage ... rests solely with on [plaintiff], it was premature to consider [defendant's] evidence."). Therefore, these issues will not be addressed in this part of the analysis.

Taken in the context of Plaintiff's proof only, the statements about the 45–year old candidate and Professor McClure could constitute "invidious comments about others in the employee's protected group" as contemplated by *Chambers v. TRM Copy Centers Corp.*, 43 F.3d at 37. Therefore, and in light of the minimal standard imposed upon the Plaintiff at this stage, the Court finds that the Plaintiff has satisfied his burden of demonstrating a *prima facie* case of age discrimination.

### b. Race Discrimination

■ With regard to the issue of race[4] discrimination, Plaintiff asserts that Skidmore has never had an African American tenured professor and that, when combined with other evidence of racial over-

tones at the College, he makes out a *prima facie* case of race discrimination.

While Plaintiff was not being considered for tenure and while the record is unclear whether a non-African American professor with a reappointment profile similar to Girma's was ever reappointed, it is clear from the parties' various submissions that reappointment is considered as a necessary prerequisite to, and a strong showing of support for, tenure. The logical conclusion could be drawn by a trier of fact that if the employer is intent on preventing African American's from being considered for tenure, a denial of reappointment is a effective preemptive means to avoid same. Thus, a question of fact exists as to whether a "similarly situated" non-African American professor was granted tenure, *Graham*, 230 F.3d at 39 ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury."), and, therefore, whether Skidmore treated Plaintiff less favorably than a similarly situated employee outside his protected group. Although a thin connection, it is sufficient on this prong of the *prima facie* case which requires only a *de minimis* demonstration.

### e. Non–Discriminatory Reason or Pretext?

Plaintiff has established a *prima facie* case of race and age discrimination. This

---

**3.** As indicated in *Bickerstaff*, on a motion for summary judgment the Court:

must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. After all, an inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.

*Bickerstaff*, 196 F.3d at 448 (internal quotation marks and citations omitted).

**4.** Neither Plaintiff nor Defendant have attempted to differentiate between the asserted discriminatory motives arising under the separate protected classifications. It is assumed that the allegation that he was discriminated against based upon his race and national origin arise from the same circumstances and therefore will be analyzed together and referred to simply as his "race" discrimination claim.

shifts the burden of production to the College to articulate a non-discriminatory basis for the employment decision in issue which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr.,* 509 U.S. at 509, 113 S.Ct. 2742 (emphasis omitted). Defendant's burden of production at this stage "is not a demanding one; [it] need only offer such a[ ] [legitimate, nondiscriminatory] explanation for the employment decision." *Bickerstaff,* 196 F.3d at 446.

█ As indicated above, Defendant asserts that the decision not to extend an offer of continued employment was taken after an evaluation through which it was determined that Girma did not meet the established criteria for reappointment. Simply put, the College asserts that Plaintiff did not meet Skidmore's teaching requirement for another three year contract as evidenced by the objective student evaluations.

█ This satisfies Defendant's burden and, consequently, shifts the burden back to Plaintiff to demonstrate that the proffered reason was not the true reason for the employment decision and that race or age was. Although the presumption of discrimination now drops from the case, the "trier of fact may still consider the evidence establishing plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.' " *Reeves,* 120 S.Ct. at 2106 (quoting *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. 1089).

█ However, "[t]o get to the jury, '[i]t is not enough ... to disbelieve the employer; the fact finder must [also] believe the plaintiff's explanation of intentional discrimination.' " *Weinstock v. Columbia Univ.,* 224 F.3d at 42 (quoting *St. Mary's,* 509 U.S. at 519, 113 S.Ct. 2742). "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false now merges with her ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Bickerstaff* 196 F.3d at 446–47 (citations omitted); *see also Reeves,* 120 S.Ct. at 2106 (Plaintiff bears the burden of demonstrating that the defendant's reasons are a pretext for a racial motivation for its actions). Put another way, Plaintiff's *prima facie* case, combined with sufficient evidence of pretext, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves,* 120 S.Ct. at 2109.[5]

### 1. Evidence of Pretext?

Plaintiff attempts to demonstrate improper pretext from two perspectives. First, he argues that procedural irregularities pervaded the review process thereby raising a question of fact as to whether the stated reason was a pretext for discrimination. Second, he seemingly challenges the validity of the College's stated reliance on student evaluations.[6] The Court will address each argument separately.

---

**5.** Thus, "once a minimal *prima facie* case is proved and the employer's nondiscriminatory explanation has been given, the *McDonnell Douglas* presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred."

*James v. New York Racing Ass'n,* 233 F.3d 149, 156 (2d Cir.2000).

**6.** In this regard Plaintiff asserts:
Defendant cites *Bickerstaff* for the proposition that [it] is acceptable for an academic institution to rely upon student evaluations in making a determination as to whether to reappoint a member of the faculty. Howev-

### a. Procedural Irregularities

In *Bickerstaff* it was noted that procedural irregularities could be used by a finder of fact to conclude that the employer's non-discriminatory basis for the employment action was a pre-text for discrimination (and thus creates a question of fact defeating summary judgment) when the irregularities may reasonably effect the decision and are indicative of a discriminatory motive. *Bickerstaff,* 196 F.3d at 453–54. Here, the "irregularities" which Plaintiff complains of do neither.

The asserted procedural irregularities focus on: (a) whether the committee employed the correct procedure for inviting faculty comment on Plaintiff's reappointment; (b) whether the DOB Personnel Committee reviewed a favorable faculty letter from a visiting professor, Prof. Williams, that may have been submitted late, and (c) whether some invidious discriminatory evidence might be inferred from the lack of minutes from various minutes of the DOB Personnel Committee meetings. These attempts to a create genuine question of material fact as to pretext are unavailing. Plaintiff cannot demonstrate that, absent these circumstances, the committee's outcome would have been different.

With regard to whether the proper procedure of inviting co-faculty statement was followed, the procedure allowed for comment by professors with two or more years with the College. After the DOB Committee and Rotheim made their respective recommendations not to reappoint Plaintiff, Rotheim sent a letter to the Acting Dean dated 1/29/99. This letter, which Rotheim also filed with the College's Committee on Academic Freedom and Rights,

indicated that while the Faculty Handbook procedure was followed (*e.g.* that an invitation was made to all eligible faculty to comment on Girma's reappointment), his actual recommendation to the Dean on Plaintiff's reappointment misquoted the procedure used, thereby giving the false impression that comment was actually received from every eligible professor. The Committee on Academic Freedom and Rights rejected the letter because, it stated, no action regarding Professor Girma was pending.

Girma argues now, however, that the combination of Rotheim's letter and its rejection by the Committee on Academic Freedom and Rights creates a question of fact as to whether the correct procedure was followed. Nonetheless, Plaintiff points to no admissible evidence demonstrating that the proper procedure in this regard was not followed. His argument in this vein amounts merely to surmise and conjecture which are insufficient to defeat summary judgment. *Bickerstaff,* 196 F.3d at 448. He does not contradict the adequately supported position of the Defendant that the January 29, 1999 letter was simply a statement correcting a clerical error, not an admission of a procedural error. The rejection of the letter by the Committee on Academic Freedom and Rights indicates only that Rotheim was unaware of proper internal procedure when such a mistake was made, not that the procedure was tainted or that Rotheim was attempting some after-the-fact cover up as Plaintiff urges.

Further, Plaintiff has failed to demonstrate that consideration of Prof. William's letter would have altered the various recommendations and therefore, even assum-

---

er, in *Bickerstaff,* the plaintiff apparently conceded that the evaluation process was valid, and did not contest the accuracy of the student evaluations. In contrast, the

evaluation process at issue in the instant case is disputed.

Plf.'s Mem. Law., pp. 16–17.

ing that the letter was timely received yet not considered, it does not create a genuine question of material fact as to whether the College's stated reason was a pretext for discrimination. As pointed out above, the reappointment decision does not hinge on faculty approval but rather is a decision based upon many factors. Here, each level of recommendation to the President focused primarily on Girma's teaching ability as that criterion was assessed through the otherwise objective student evaluations.

Thus, even if every member of the faculty supported Girma's candidacy, it is conceivable that reappointment would not have been recommended because student evaluations were below expectation. Consequently, even assuming *arguendo* that Professor William's supportive letter was received in a timely fashion and considered by the committee or other recommenders, Girma still fails to show that it would have changed the outcome of the recommendations. Girma offers nothing from which a reasonable trier of fact could conclude that consideration of the William's letter would have overridden the major focus of each recommendation which was the objective criteria of teaching quality as ascertained through the student evaluations.

Plaintiff also asserts that an inference of discrimination can be drawn from the fact that he and his counsel did not receive all of the Personnel Committee's notes during discovery. Prof. Rotheim indicates that all of the notes he had were produced during his deposition and, for whatever reason, were not copied. The receipt of copies of these notes, however, is a discovery issue which should have been resolved long before this motion was submitted. The fact that the notes were not copied, or even that the committee did not keep notes of their deliberations, does not create a triable issue of fact as to whether the decisions makers were motivated by dis-

criminatory animus when they made their decisions not to recommend Plaintiff for reappointment. It is nothing more that mere surmise and speculation that something insidious occurred and, therefore, does not carry Plaintiff's burden to show that a genuine question of material fact exists. *See Bickerstaff,* 196 F.3d at 451.

Thus drawing all inferences in Plaintiff's favor, and taking the record as a whole, no reasonable finder of fact would conclude that these asserted "procedural irregularities" would have changed the committee's outcome. Further, these issues do not give rise to a conclusion that the reason for the non-reappointment was a pretext from which an inference of discrimination could be drawn. *See Bickerstaff,* 196 F.3d at 448.

### b. Reliance on Student Evaluation

██ Girma also challenges the validity of Defendant's reliance on the student evaluations, expressing dissatisfaction with the fact that Skidmore places such great reliance on student evaluations in making its reappointment decisions. In an attempt to seemingly "dispute" the accuracy of the students' overall low scores for his teaching abilities, he points out that some of the faculty members who sat in on his courses gave him high marks for teaching abilities and that Professor Rotheim stated in the 1997–1998 academic year that he was "flummoxed" by the low statistical short form evaluations.

Plaintiff argues further that the low marks the students gave him were, in essence, the results of the students' inability to recognize quality teaching when they saw it. He asserts that the students were not sufficiently motivated to learn and were unjustifiably put off by his pedagogical style that sought to invoke hard work from students who would rather sit back and be spoon-fed.

Such conclusions, however, are just that—conclusions. They do not demonstrate with any specificity how the process was flawed or how it was skewed in some way to cover for intentional discrimination. A fellow professor's view of Girma's classroom performance, while important, does not substitute for the five semesters of student evaluations which the various recommenders relied upon. Plaintiff does not argue that the recommenders failed to accurately report the results of the long and short form evaluations, but rather that the College should not have relied so heavily thereupon.

The fact that the College relies upon its students' evaluations in determining whether to renew a professor's contract is a decision which the institution itself must make and one which cannot be second guessed by this Court. Indeed, in *Bickerstaff*, the Circuit's decision went to some length to impress the point that a college "has a right to set its own criteria for promotion and then to evaluate a candidate's fitness for promotion under them." *Bickerstaff* at 455. *Bickerstaff* cited *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980) for the proposition that "[a] university's prerogative 'to determine for itself on academic grounds who may teach' is an important part of our long tradition of academic freedom." *Id.* (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., joined by Harlan, J., concurring in the result)). Further, in a footnote, *Bickerstaff* quoted the Third Circuit which held:

[C]ourts ... should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have

been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.

*Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir.1980).

In that same footnote, the Circuit quoted Judge Calabresi's observation in his concurring opinion in *Fisher III* that it is "always pernicious" for a court to set standards for the employer, and "[i]t is particularly pernicious in academic contexts, where, second only to athletics, we all think that we are better coaches than the coaches themselves." *Fisher III*, 114 F.3d at 1361 n. 13 (Calabresi, J., concurring in part and dissenting in part).

As indicated further in *Bickerstaff*, this Court's "role is narrowly limited to determining whether an illegitimate discriminatory reason played a motivating role in the employment decision." *Bickerstaff* at 456. The conclusion drawn by the Plaintiff, that is, that he was qualified to hold the position because the students did not know what was good for them and therefore the College should not have focused on this criterion, is insupportable in this context. Since the College chose to rely upon student perception of teaching quality, no matter how variant this perception is from that of the professors, absent a demonstration of disparate application of this criterion it does not create a genuine question of material fact as to whether the use of the criterion is a pretext for discrimination. Despite the fact that the Court must draw all reasonable inferences in his favor, Plaintiff has offered nothing from which a reasonable trier of fact could conclude, using the employer's criteria, that he was qualified to continue holding the position

or that the criteria was not applied uniformly. Consequently, there is no support for the position that the stated basis for the College's determination was a pretext for discrimination.

## 2. Other Indicia of Discrimination

The Circuit has also held that a plaintiff may survive summary judgment by demonstrating that, while the employer's stated reason may not be false, invidious discrimination also motivated the determination and therefore a question of fact exists as to the primary motive for the decision. *See Holtz v. Rockefeller & Co.,* 2001 WL 834023, at * 11 (July 10, 2001)("To defeat summary judgment within the *McDonnell Douglas* framework, moreover, 'the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.' ")(quoting *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995)); *see also Reeves,* 530 U.S. at 147, 120 S.Ct. 2097; *Bickerstaff,* 196 F.3d at 447. This, in turn, brings the Court back to considering whether Plaintiff has satisfied his burden of demonstrating invidious discrimination under the two theories—race and age. At this stage of the analysis, however, the Court reviews the allegation in the context of the evidence presented by both parties staying within the parameters of such review afforded by Rule 56.

### a. Age discrimination

As above set-forth, on the issue of age discrimination, Plaintiff offers little more than his own subjective beliefs that age played some role in the College's determination not to reappoint him. However, this subjective belief is not supported by any admissible evidence tying age to the employment decision in issue. Plaintiff does not dispute that in the year that Rotheim and the other professors determined not to support Girma's application for re-appointment, Rotheim and the College supported the reappointment of Prof. Kennelly, who is approximately the same age as Plaintiff, and to grant tenure to Gary McClure who was in his 60's.[7] While "the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision," *Bickerstaff,* 196 F.3d at 450, Plaintiff has not supplied evidence from which a reasonable finder of fact could conclude that Rotheim or any of the other five decisions makers in the reappointment process harbored any age-based animus.

Rotheim's age-related comments, taken as true, do not impact Plaintiff's employment circumstances. The only comment regarding Girma are the uncontradicted statements wherein Rotheim inquired about Girma's and his wife's ages in the context of a conversation which Plaintiff initiated and which had no discriminatory overtones.

Further, even assuming that Rotheim harbored age-related animus as he suppos-

---

**7.** Plaintiff attempts to buttress his age biased argument by pointing to the situation of Professor Oppedisano, who proclaims herself as being "generally regarded as one of the best teachers in the Business Department and at Skidmore." While Prof. Oppedisano opines that the reason she was not offered tenure was because of her age (over 40) and her high visibility on the subject of sexual harassment on campus, this evidence, even if true, does not demonstrate that similarly situated employees not in the protected classification of age were treated differently than Plaintiff. In this regard, the Plaintiff has not produced evidence of younger professors with as equally poor teaching performances as Plaintiff who had been recommended for reappointment.

edly expressed about others, the decision making process here involved six persons: the three members of the Personnel Committee (Professors Canavan, Correa and Balevic); Department Chairman Rotheim; Acting Dean Susan Bender, and, ultimately, the College's Interim President, Phyllis Roth. There is no indication in the record that Rotheim somehow imposed this animus upon the decision-makers, both above and below him, so as to force these others to join in his discriminatory feelings with regard to Girma. Rather, every one of the decision makers cited as a basis for their decision the student evaluations which, even assuming Rotheim was biased against the Plaintiff because of his age, could not have been affected by this improper motive. This includes Professor Balevic who stated in an affidavit that despite her enthusiastic support for Girma's reappointment in the Spring of 1998, she withdrew that support after she reviewed his Fall of 1998 long form evaluations which indicated a decline in Girma's teaching reviews by students. Thus, Plaintiff offers no evidence from which a rational finder of fact could conclude that Rotheim's age bias was somehow imposed upon the other decision makers.

It also noteworthy that while working at Skidmore, Girma complained to administrators that he felt Rotheim was race-biased against him, but not age-biased. Further, Girma, who was born in 1951, was within the protected classification of the ADEA when he was hired in 1996 just three years before the employment decision he now challenges as aged biased.

Plaintiff has provided no evidence from which a reasonable finder of fact could draw the logical conclusion that, given the undisputed facts, the decision not to reappoint plaintiff was motivated by considerations of his age (whether over 40 or otherwise).[8] There simply are no circumstances surrounding the College's decision not to reappoint Plaintiff from which a reasonable trier of fact could conclude that age motivated this decision.

**b. Race discrimination**

Girma's allegations of race discrimination are similarly based upon mere conjecture and surmise, consisting only of his feelings of being discriminated against. His allegation of disparate treatment because Professor Rotheim met with him in the school cafeteria is just such an example. While Girma indicates that he does not feel that Rotheim would have met with Caucasian professors under such circumstances, he provides no evidence from which to conclude that others were treated differently.

Even his allegation that the school has never had an African American tenured professor does not suffice to create a question of act as to the ultimate issue here, that is, whether a reasonable finder of fact could conclude that the College's decision not to offer him a three year reappointment was motivated to some degree by issues of race. This is because the Plaintiff offers no evidence that any professor who was promoted, either by reappointment or tenure, had an equally poor student evaluation profile as he did. Indeed, had Plaintiff demonstrated that the College's criteria was not uniformly applied, then, given the other indicia of racial overtones arising in the course of his hiring, the Court could conclude that a question of fact exists as to discriminatory motive. However, he has not done this. While the Court is surprised to learn that the Col-

---

8. The NYSHRL does not limit the protected classification for age, but rather provides protection from employment discrimination based on age considerations for all employees over the age of eighteen. *See* N.Y. Exec. Law § 296(3–a)(a).

lege has never had a African American tenured professor, it would be sheer speculation, without more, to draw the conclusion that this is because of discriminatory motive. Plaintiff has not offered the connection between this seeming anomaly and the result he seeks, a conclusion that race motivated this result.

Consequently, not only has he not meet his burden under *McDonnell Douglas* of demonstrating that race motivated the decision, he has not met his burden under the more general application on a Rule 56 motion. The defendant has demonstrated by admissible proof that it is entitled to summary judgment because it made its determination upon a non-discriminatory basis. Plaintiff has not responded by providing any evidence other than broad conclusory allegations based upon surmise and speculation that race motivated this decision. *See West–Fair Elec. Contractors v. Aetna Cas. & Surety Co.,* 78 F.3d 61, 63 (2d Cir.1996)(Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists.); *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996)(mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.).

## III. CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment is **GRANTED** in its entirety and Plaintiff's action is dismissed on the merits.

**IT IS SO ORDERED.**