DEBRA ANN LIVINGSTON, Circuit
Judge, dissenting:
I cannot join in the majority’s determination that a reasonable jury might conclude that the decision not to hire the plaintiff, Rita Walsh, as a bricklayer was attributable even in part to sex discrimination. By her own admission during the job interview, Walsh, an experienced tile setter, was not a bricklayer. As she candidly stated during the interview when asked about her bricklaying experience, Walsh had “done a glass block shower at the Home Depot Expo,” but “[tjhat was pretty much it.... I’ve done little things on my own but nothing, you know.” J.A. 267. Given her admission that she lacked any experience in the skilled trade in which she sought a position, it is highly doubtful that Walsh established even a prima facie case. Assuming she did, it is abundantly clear that the New York City Housing Authority (“NYCHA”) mustered at step two as persuasive a “legitimate, nondiscriminatory reason” for this failure-to-hire as one could imagine — namely, that Walsh herself admitted to having virtually no bricklaying experience during her interview for the position.[1]
With respect, moreover, the triable case that the majority perceives at step three (supposedly from looking at the record as a whole) is an illusion. The majority’s fanciful approach to the summary judgment standard requires the majority, against all evidence in the record, either to equate tile setting and bricklaying, two distinct trades, or utterly to deny the skills associated with bricklaying — skills that Walsh could undoubtedly acquire, but that she does not now have, by her own admission. I cannot agree with the majority’s assessment that the record here could support a reasonable jury verdict in favor of the plaintiff. Accordingly, I would affirm for substantially the reasons stated in the opinion of the United States District Court for the Southern District of New York (Buchwald, J.).
*82 I.[2]
A.
In the New York City civil-service system, the stated qualifications — as established by the New York City Department of Citywide and Administrative Services (“DCAS”) — for the position of Bricklayer include either (1) at least five years of “full-time satisfactory experience as a bricklayer,” or, alternatively, (2) at least three years of such experience, plus “sufficient training of a relevant nature ... to make up the equivalent of three years of acceptable experience.”[3] J.A. 279. Applicants undergo a multi-step application process. At the first' stage, applicants must pass a written, civil-service examination administered by DCAS. After the examination, DCAS places applicants with a passing score on an “eligible list,” providing them with a “list number” based on their examination score. J.A. 276. As openings arise, DCAS refers candidates for interviews based on their list number.[4] The record suggests that interviewers — at least those in this case — expect candidates at the interview stage to have satisfied the bare DCAS requirements. Interviewers seek to confirm during the interview that applicants possess the basic ability to do bricklaying work, to assess whether they can show up for work on time, and to determine their borough preferences.
DCAS defines the duties and responsibilities of bricklayers.[5] As a general matter, bricklayers “lay[ ] bricks and masonry to line and grade in or on a given structure or form of work.” J.A. 278. “Typical tasks” include “[ ]lay[ing] brick or masonry units ... for walls and partitions,” “[w]ork[ing] with refractory and insulating units for boiler settings and combustion chambers,” “[d]o[ing] fireproofing, block arching, terra cotta cutting and setting,” “[c]onstruct[ing] brick masonry sewers and manholes,” and various administrative tasks. J.A. 278. According to James Lollo, a bricklayer supervisor for the Technical Services Department, bricklaying work for the City can include wall construction, brick replacement, reconstructing door frames, glass-block installation, incinerator and boiler repair, fireproofing and fire-brick installation inside the trash compactor, fire chamber and flues, and concrete laying. The record is undisputed, moreover, that all bricklayers are expected to perform all duties within the job title.
Bricklayers in the New York City civil-service system also perform tasks ordinarily done by tile setters, a related but distinct trade.[6] Although the parties disagree *83 as to how much tile-setting a New York City bricklayer performs, there does not appear to be a dispute as to the technical differences between bricklaying and tile-setting.[7] As James Lollo, a bricklaying supervisor for the Technical Services Department, testified during his deposition, “[l]aying brick is significantly more difficult than laying tile.... [T]o lay brick, plumb, level and square, is extremely difficult. ...” J.A. 162. Whereas tile-setting involves applying masonry units to a standing structure, bricklaying entails creating a freestanding structure from scratch. In Lollo’s words, “[bjuilding a wall is significantly more difficult than putting tile on a wall or on a floor.”[8] Id.
B.
Walsh began the application process in 2005, taking the civil-service written examination on October 15 of that year. She received a passing score, and DCAS placed her 55th on the eligibility list. More than four years later, in January 2010, NYCHA had openings to hire five new bricklayers for Borough Management Departments— three in Brooklyn and two in Manhattan. DCAS sent NYCHA’s Human Resources Department a list of eight individuals from the eligibility list, including Walsh. NY-CHA then sent letters to each of the eight applicants and, on February 24, 2010, six of them appeared at the agency’s Human Resources Department to interview for the five positions. The six candidates who appeared were — in order of their positions on the eligibility list — Ferdinand Arlia, Joseph Giannotti, Michael Zambino, Emmanuel Sylvester, Rita Walsh, and Giuseppe Grippi. At the time of the interview, Gian-notti and Grippi worked for NYCHA in non-bricklayer capacities. All interviewees brought resumes, except for Grippi.
Four City employees conducted the interviews: Fred Singer, Wanda Gilliam, James Lollo, and Charles Pawson. Singer and Gilliam were Borough Administrators for Skilled Trades in Manhattan and *84 Brooklyn, respectively. Lollo was a Technical Adviser in the Technical Services Department, and had spent his career as a bricklayer or bricklaying supervisor for the City. Pawson was a Deputy Director for the Technical Services Department.
Overall, “[t]he purpose of [the] questions and the interviews in general,” as the district court noted, “was to ascertain whether the candidates had adequate knowledge of bricklaying and could perform the job well, not to determine whether the candidates met the qualification requirements established by DCAS.” Walsh v. N.Y.C. Hous. Auth., No. 11 Civ. 6342 NRB, 2013 WL 6669381, at *2 (S.D.N.Y. Dec. 16, 2013). Each interviewer had a different understanding of his or her role. Gilliam had the final say on hiring for the Brooklyn positions, but had no special knowledge about bricklaying. From her experience in similar interviews, Gilliam left it to the representatives from the Technical Services Department — in this case, James Lollo — to ask technical questions; she would ask about borough preferences and the ability to attend work. As she put it, Gilliam was looking for “[s]omeone who could fit into the position of bricklayer, someone who can easily adapt to our, óur agency’s requirements to do X number of jobs a day, somebody just[, in] general, just a person who can fit into that capacity ... [with] [s]ome overall knowledge of the job.” Singer, as the Manhattan representative, also had the final say over the Manhattan positions, but described the interview process as involving a joint hiring decision made with the technical advisers. He, like Gilliam, had no bricklaying experience. Lollo was the technical expert of the group. He had spent his career as a bricklayer, and felt that his responsibility in the interview was to determine whether applicants “had knowledge of the bricklaying and masonry trades.” J.A. 127. Finally, Pawson said little in the interviews. He explained that Lollo asked technical questions, and that his job was simply to sit in on the process.[9]
Walsh’s interviewers received her resume, which states, in relevant part, that she spent four months at the Tile Mechanic Training Center and worked from 1995 to 2010 as a Tile Mechanic for the Tile, Marble and Terrazo Division of the Bricklayers and Allied Craftsman Union. The portion of the resume about Walsh’s tile-setting work adds that her responsibilities include installing tile or marble “on walls and floors,” leveling and plumbing tile on walls and floors, “[w]ater proofing” walls, and “cutting and installing] saddles [and] soap dishes.” J.A. 651.
At her deposition, Walsh stated that she could not recall whether the interviewers gave her any description of the job. They asked some non-technical questions, including whether she had a fear of heights, whether she was able to work in cramped spaces, and whether she was available for overtime. Walsh also recalled that she was asked a technical question about mixing cement.
With regard to her work experience, Walsh testified that “[t]hey asked if I had experience laying brick.” J.A. 267. She recounted that she had “done a glass block shower at the Home Depot Expo,” but *85 “that was pretty much it.... I’ve done little things on my own but nothing, you know.”[10] Id. Walsh thus provided the interviewers with a candid (and accurate) assessment of her experience. In response to questioning at her deposition, Walsh elaborated that she has never held the title of bricklayer, and that in her experience working for various companies between 1995 and 2011 as a tile setter, she has never constructed a wall with brick or cement block, never constructed a parapet or block arch, never constructed masonry sewer or manholes, never done fireproofing with brick or worked with refractory or insulating materials — indeed, that she is unaware of what such materials are. Walsh, who had never before applied for a position as a bricklayer, also made clear at her deposition that she has never served an apprenticeship as a bricklayer and that the apprenticeship for tile setter is not the same thing.
Walsh’s recollection of her interview as it relates to the discussion of her work experience is generally consistent with that of each of the interviewers. Gilliam recalled Walsh saying that “she did not have any knowledge of brickwork ... her experiences were mostly with the ceramic tiles, but that she was a hard worker and a quick learner and that she was willing to do what she needed to do.”[11] J.A. 108. Similarly, Pawson and Singer both remembered that Walsh said that she had not worked with brick or block. Finally, Lollo recounted:
Obviously, [Walsh] has tile experience, you know, being a Local 7 member. And then usually in an interview, we ask people to tell us a little about themselves first. And then when I asked her what specific experience do you have with brick and block, to the best of my recollection, her answer was, to be honest, I don’t have any.... I was kind of shocked that somebody would actually come, because the title is bricklayer, and come right out and tell everybody you have no experience with brick or block.
J.A. 156-57.
The interviewers unanimously agreed not to offer Walsh a position, citing as the reason her lack of experience with brick and block. At least one person noted that Walsh would have been a good candidate for a mason’s helper position, where she would presumably have learned requisite bricklaying skills. Indeed, Akugbe made a notion to that effect — “*consider Mason Help[er]” — on Walsh’s resume during the interview process. J.A. 298. After the interviewers made their decision, Akugbe informed Walsh that NYCHA would not be offering her a position. The interviewers extended offers to all five male candidates interviewed that day, although one of these offers was later retracted when investigation established that the candidate lacked the requisite experience.
*86 C.
On September 12, 2011, Walsh filed suit, claiming that NYCHA discriminated against her on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law. Following discovery, NYCHA moved for summary judgment. NYCHA argued that Walsh failed to establish a prima facie case of discrimination or, in the alternative, that no reasonable jury could conclude that NYCHA’s rationale for not hiring her was a pretext for discrimination on the basis of sex. The district court issued a memorandum and order granting summary judgment to NYCHA on December 16, 2013. See Walsh, 2013 WL 6669381, at *11.
The district court noted that “[i]t is far from clear that plaintiff possessed the necessary qualifications to become a bricklayer,” but elected to assume without deciding, given the minimal burden of establishing a prima facie case, that Walsh’s time as a tile setter qualified her for the bricklayer position and that the circumstances surrounding the interview raised an inference of discrimination. Id. at *8. Judge Buchwald went on to note, however, that NYCHA had a legitimate, nondis-eriminatory reason for choosing the five male candidates over Walsh: namely, that she “admittedly [had] extremely limited experience with brick and block.” Id. at *9.
With this explanation in mind, the court turned to whether Walsh had “produced evidence from which a rational jury could find that gender was more likely than not a motivating factor in NYCHA’s refusal to hire her.” Id. As relevant here, the court assessed evidence put forward by Walsh that: (1) NYCHA has never had a female bricklayer so far as the interviewers recalled; (2) plaintiff supposedly had superi- or qualifications to other candidates who were hired; and (3) Akugbe allegedly informed Walsh at the time of her rejection that the interviewers rejected her because “they wanted somebody stronger.” Id. The district court concluded that this evidence “falls short of raising a triable issue of fact that NYCHA’s refusal to hire [Walsh] was based on her gender.” Id. The district court therefore granted summary judgment for NYCHA on Walsh’s Title VII and New York State Human Rights Law claims. Id. at *10-11. However, because a more liberal standard applies to discrimination claims under the New York City Human Rights Law, the court declined to exercise supplemental jurisdiction over that remaining claim and dismissed it without prejudice. Id. at *11. This appeal followed.
II.
We “review a district court’s decision to grant summary judgment de novo, resolving all ambiguities and drawing all permissible factual inferences in favor of the party against whom summary judgment is sought.” Burg v. Gosselin, 591 F.3d 95, 97 (2d Cir. 2010) (quoting Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009)). Title VII makes it unlawful for an employer to “refuse to hire ... any individual ... because of such individual’s ... sex.” 42 U.S.C. § 2000e-2(a)(l). “An employment decision, then, violates Title VII when it is ‘based in whole or in part on discrimination.’ ”[12] Holcomb, 521 F.3d at 137 (quoting Feingold v. N.Y., 366 F.3d 138, 152 (2d Cir. *87 2004)). “In assessing the record to determine whether there is a genuine issue to be tried” in Title VII cases, courts must “carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.” Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999). “The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.” Burdine, 450 U.S. at 253, 101 S.Ct. 1089.
Walsh has not adduced sufficient evidence to raise a triable issue of fact on this ultimate question. In arguing to the contrary, the majority contends that the district court “failed to view Walsh’s evidence as a whole.” Maj. Op. at 76. Examining each piece of evidence on which the majority relies, however, it is clear that whether viewed item-by-item or all together, the evidence here is simply inadequate to support a reasonable conclusion, at step three, that NYCHA’s “proffered, non-diserimina-tory reason” for not hiring the plaintiff— namely, that she lacked bricklaying experience — was “a mere pretext for actual discrimination.” [13] Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000); see also Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005) (“[P]laintiff must prove that a defendant’s proffered reasons were not the true reasons for its actions but a pretext for discrimination.”). To be sure, “bits and pieces” of evidence, when viewed together, may form a “mosaic” of discrimination. Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015) (quoting Gallagher v. Delaney, 139 F.3d 338, 342 (2d Cir. 1998)). But the obligation to look at the record as a whole does not afford reviewing courts a license to “[t]roll[] for an issue of fact,” Weinstock, 224 F.3d at 41, contrary to this court’s recognition that the “salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to ... other areas of litigation.” Id. at 46 (alteration in original) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)); see also Aikens, 460 U.S. at 716, 103 S.Ct. 1478 (noting that neither trial courts nor reviewing courts “should treat discrimination differently from other ultimate questions of fact”).
The majority first points to evidence that at the time of Walsh’s interview, no women were employed by NYCHA as bricklayers and, so far as the interviewers knew, no woman had held this civil service position.[14] But on the record here, this evidence is of no appreciable weight— maybe not even a scintilla — in establishing that there was intentional discrimination in the decision not to hire Walsh. In individual disparate treatment cases, contrary to the majority’s claim, “statistical evidence is less significant than in disparate impact or pattern and practice cases, because the ultimate issue is whether a particular plaintiff was the victim of an illegitimately motivated employment decision.” 21A Federal Procedure, Lawyers Edition § 50:1021 (2016); see also United States v. City of *88 N.Y., 717 F.3d 72, 83 (2d Cir. 2013). This general proposition is particularly apt here, moreover, where the statistical evidence at issue — the absence of women among NYCHA’s bricklayers — is presented devoid of any necessary contextual information as to how many women have applied for positions as bricklayers at NY-CHA, the nature of their qualifications, or even the time period at issue and the number of bricklayers that NYCHA employed during that time.[15] Cf. Pollis v. New Sch. for Soc. Research, 132 F.3d 115, 123 (2d Cir. 1997) (concluding that because the relevant statistical group was “so tiny, was spread over such a long period, and was composed so largely of individuals who were not fairly comparable to her,” plaintiffs statistics “[did] not support an inference about the School’s motivations” and evidence lacked “logical tendency to show that discrimination was present”). The majority notes that an “inexorable zero” may sometimes support a “weak inference” of discrimination in the pattern-or-practice context, citing United States v. City of N.Y., 713 F.Supp.2d at 318. But on the record here, that unadorned number says nothing about whether this particular group of interviewers declined to hire Walsh because of her sex, at least absent “[m]ore particularized evidence relating to the individual plaintiff! ].” Zahorik v. Cornell Univ., 729 F.2d 85, 95 (2d Cir. 1984); see also Weinstock, 224 F.3d at 46 (noting that raw data “purportedly describing a pattern of under-representation and unequal opportunity for women faculty at Columbia ... provided] no foundation for the assertion that there was discrimination” in a particular woman’s tenure process).
There is no such particularized evidence in this record. The majority endeavors to find some discrepancy in qualifications, opining that “a rational finder of fact could reasonably conclude” that Walsh’s tile-setting experience was superior to that of Zambino, one of the five men offered employment on the day that Walsh interviewed.[16] Maj. Op. at 78. Even assuming that Walsh is a qualified tile setter, however, she told the interviewers that she had no experience with brick or block — a proposition that includes wall construction, block arching, fireproofing, boiler repair, constructing brick masonry sewers and manholes, and the many other bricklaying tasks that NYCHA bricklayers routinely perform. While the record does not discuss Zambino’s interview, Zambino’s resume, in contrast, states that he performed “[p]oint- *89 ing, cleaning and caulking brick work” for Blade Contracting, as well as “[m]asonry restoration ..., [waterproofing ..., [lintel] replacement, [masonry] work.” J.A. 680. It also shows that he completed four courses at the International Masonry Institute, receiving a “Pointer, Cleaner, Caulker Certificate.” J.A. 681. Zambino’s job offer, moreover, was later retracted when it was determined that, in fact, he lacked the requisite five years of bricklaying experience. But at the time of the interview, Zambino, like the other four successful applicants, presented himself as having bricklaying experience. Walsh did not.
The majority endeavors to sidestep this basic problem — that Walsh lacked bricklaying experience, and admitted as much in her job interview — by pointing to evidence that some bricklayers at NYCHA do a substantial amount of tile work. The record is undisputed, however, that bricklayers at NYCHA must be proficient in all duties under the job title, including brick and block construction, masonry repair, and boiler overhauling. As Wanda Gilliam, Borough Administrator for the Skilled Trades in Brooklyn put it, “bricklayers are supposed to perform all kinds of tasks,” and “[w]e don’t know what’s on the work orders until they get the job.” J.A. 86. It is thus irrelevant, even if true, that Walsh has more tile-setting experience than Zam-bino, given her professed lack of experience in bricklaying. As we recently stated, Title VII prohibits discrimination: It “is not an invitation for courts to ‘sit as a super-personnel department that reexamines’ employers’ judgments,” whether related to the proper standards for tenure or for proficiency in bricklaying. Chen v. City Univ. of N.Y., 805 F.3d 59, 73 (2d Cir. 2015) (quoting Delaney v. Bank of Am. Corp., 766 F.3d 163, 169 (2d Cir. 2014) (per curiam)); see also Weinstock, 224 F.3d at 43 (noting that court’s “role is narrowly limited to determining whether an illegitimate discriminatory reason played a motivating role in the employment decision” (quoting Bickerstaff, 196 F.3d at 456)); Bickerstaff, 196 F.3d at 455 (observing that “Vassar alone has the right to set its own criteria for promotion and then to evaluate a candidate’s fitness for promotion under them”).
Recognizing the weakness in its position, the majority hurries on to note that “[perhaps more significant” than the supposed discrepancy of skills between Walsh and Zambino is the evidence that, according to Walsh, she was - asked only one technical question during her interview. Maj. Op. at 78-79. But it is the majority that now fails to assess the record as a whole. Perhaps such a fact could be probative in another case, but it is wholly inadequate to raise an inference of discrimination here, and for one simple reason: namely, that given Walsh’s admitted lack of bricklaying experience, it is hardly surprising that the interviewers declined to press her on the intricacies of the field. In any event, even drawing all inferences in Walsh’s favor, it is in fact unclear whether the interviewers asked Walsh fewer technical questions than they did the others. Walsh testified that an interviewer asked her about mixing cement and about her bricklaying experience, but did not ask any questions about bricklaying techniques. Giannotti recalled receiving a similar pair of questions, while Sylvester remembers being asked only about the tools used for bricklaying and tile cutting. The record lacks information about the other candidates’ interviews.
That brings us to the single piece of evidence on which the majority really relies: namely, that Akugbe supposedly told Walsh, after her interview, that the inter *90 viewers “wanted somebody stronger.”[17] J.A. 638. The record is undisputed that physical strength was not discussed during Walsh’s interview. According to both the interviewers and Akugbe (who was not a decisionmaker, but there to assist in the interview process) there was also no discussion among the decisionmakers about any need for physical strength, as opposed to experience.
Setting this aside, however, and properly assuming, at the summary judgment stage, that Akugbe did, in fact, make the statement attributed to him by Walsh, there is a more fundamental problem: namely, that Akugbe’s alleged statement very plausibly could refer not to Walsh’s physical strength (and to gender stereotypes about physical strength) but to Walsh’s near total lack of experience and to the fact that she was not a strong candidate, in light of her inexperience as a bricklayer. In such circumstances, where a remark is susceptible of two or more meanings, only one of which may be relevant to discriminatory intent, it is “perfectly appropriate” for a court at the summary judgment stage (as we have said in the past) to ask whether a reasonable finder of fact, considering such a remark, “could conclude from both [the] remark and other evidence in the record that [the plaintiff] met her burden of proving pretext.”[18] Govori v. Goat Fifty, L.L.C., 519 Fed.Appx. 732, 735 (2d Cir. 2013); see also Weinstock, 224 F.3d at 43-44 (rejecting argument that referring to female professor as “nice” and “nurturing” in regard to teaching could, without more, establish discriminatory intent in evaluation of scholarship for tenure); cf. Anderson v. Liberty Lobby, Inc., A77 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (“The mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient. ...”). Here, the record is undisputed that the plaintiff admitted during a job interview to lacking the requisite experience in a skilled trade. Setting aside the alleged remark, there is no meaningful evidence of discriminatory intent. In such circumstances, and even considering Akugbe’s alleged remark, Walsh simply has not put forward a case to support a reasonable jury verdict.
With this decision, the majority comes close to eviscerating the plaintiffs burden at step three of the McDonnell Douglas *91 test. NYCHA proffers a powerful reason (perforce a “legitimate, nondiscriminatory reason”) for declining to hire Walsh: namely, that she admitted during her job interview to lacking the required experience in a skilled trade. Walsh herself concurs in this account of what she said. The majority nevertheless concludes that Walsh has assembled just enough evidence, considered as a whole, to permit a reasonable trier of fact to draw the inference that this reason was pretextual, and that NYCHA discriminated against her on the basis of sex. With respect (and knowing the evidence on which the majority relies), one is left wondering what the majority means by “reasonable” and “inference.”
The majority’s approach to the summary judgment standard as applied to hiring decisions may perversely disserve those who seek work in fields in which they have been historically underrepresented by creating incentives on the part of employers to interview only those with impeccable paper credentials — those with formal training and evident work experience, and not those who may have the requisite knowledge and experience notwithstanding a lack of formal credentials.[19] Regardless, the law is clear that the plaintiff at step three must produce “not simply ‘some’ evidence, but ‘sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].’ ” Weinstock, 224 F.3d at 42 (quoting Van Zant v. ELM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)). That standard has not been satisfied. I respectfully dissent.

. This Court evaluates Title VII sex-discrimination claims under the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this three-step test, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination,” which requires showing membership in a protected class, qualification for the relevant position, an adverse employment action, and circumstances giving rise to an inference of discriminatory intent. Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008) (citing McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817). "If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason for its action.’ ” Id. (quoting McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817). Once the defendant provides such a reason, the burden shifts back to the plaintiff to show that the defendant’s explanation was not the only reason for the employment decision "and that [discrimination] was at least one of the motivating factors.” Id. (quoting Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995)). To be sure, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.” Id. (quoting Texas Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

. The following facts are undisputed, except where otherwise noted.

. The Notice of Examination for the bricklayer examination informs applicants that "[b]y the last day of the Application Period, [they] must have” the stated qualifications for the bricklayer position. J.A. 275 (emphasis added). However, applicants may take the examination before the City checks their qualifications for the position; the applicants themselves "are responsible for determining whether or not [they] meet the qualifications].” Id.

. It is unclear whether, aside from the civil-service examination, candidates are vetted regarding their qualifications prior to being interviewed. Indeed, to the extent the record speaks to this question, it suggests that such review occurs only after candidates have received an offer of employment.

. New York City employs bricklayers in the Technical Services Department and the Borough Management Departments. This case involves an application for the. latter position. The record indicates that, while the mix of bricklaying work differs between these positions, all bricklayers are subject to the same hiring standards.

. Brick masonry and tile-setting are generally understood to constitute separate occupations, with different skill sets. The Bureau of *83 Labor Statistics, for example, defines these trades separately, and observes that brickma-sons, "often called bricklayers,” have higher median pay levels and entry level education requirements than tile setters. Bricklayers generally complete a three to four year apprenticeship in order to "learn the trade,” unlike tile setters, who "typically learn by working with experienced installers.” And whereas bricklayers "build and repair walls, partitions, fireplaces, chimneys, and other structures,” tile setters "cut and place tile.” Compare United States Department of Labor: Bureau of Labor Statistics, Occupational Outlook Handbook: Brickmasons, Blockmasons, and Stonemasons, http://www.bls.gov/ooh/ construction-and-extraction/brickmasons-blockmasons-and-stonemasons.htm#tab-2, with United States Department of Labor: Bureau of Labor Statistics, Occupational Outlook Handbook: Tile and Marble Setters, http:// www.bls.gov/ooh/construction-and-extraction/ tile-and-marble-setters.htm.

. Indeed, Walsh herself recognized the distinction between bricklaying and tile-setting during her interview, stating that, despite extensive experience setting tile, she had virtually no experience in bricklaying. In particular, Walsh stated that she had.done only a "glass block shower at the Home Depot Expo,” but "that was pretty much it.... I’ve done little things on my own but nothing, you know." J.A. 267.

. In addition to bricklayers, New York City employs "mason's helpers,” who “assist!] bricklayers and cement masons in the preparation and finishing of cement, concrete, brick, tile, and other masonry work.” J.A. 280. Technically, the mason’s helper position is a stepping stone to becoming a cement mason, not a bricklayer. But the cement mason position no longer exists in New York City, and such work has been performed by bricklayers. City employees testified that mason’s helpers often learn, many of the skills that bricklayers use, including where to set the block, what kind of mix and mortar to use, how to build a scaffold, and how properly to retemper mortar.

. A fifth city employee, Osagie Akugbe, organized and observed the interviews, but was not an official interviewer. Akugbe worked in NYCHA's Human Resources Department and sent the interview letters to applicants. When the applicants arrived, he told them the number of vacancies and described the interview process. Akugbe also spoke to the four interviewers about the interview process, the applicant order, and questions to be avoided. It was also his job to inform applicants about the interviewers' final decisions, and to give employment paperwork to applicants who received offers.

. Bricklayers work with both “brick” and "block” (i.e., concrete block). See United States Department of Labor: Bureau of Labor Statistics, Occupational Outlook Handbook: Brickmasons, Blockmasons, and Stonemasons, http://www.bls.gov/ooh/construction-and-extraction/brickmasons-blockmasons-and-stonemasons.htm#tab-l (emphasis omitted) (“Brickmasons and blockmasons — often called bricklayers — build and repair walls, floors, partitions, fireplaces, chimneys, and other structures with brick, precast masonry panels, concrete block, and other masonry materials.”).

. Gilliam also stated that Walsh answered one question regarding boiler overhaul by stating that she was "not aware of” the necessary tools and asking if a mason’s helper (at NYCHA, the bricklayer’s assistant) could “help with some of those tasks.” J.A. 106. Walsh, however, denies being asked questions about this subject.

. The substantive standards for liability under the New York State Human Rights Law are "analytically identical” to those "under Title VII.” Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 107 n. 10 (2d Cir. 2011) (quoting Torres v. Pisano, 116 F.3d 625, 629 n. 1 (2d Cir. 1997)).

. As already noted, I have my doubts that Walsh raised even a prima facie case. Because the majority proceeds to step three, however, and because it does not matter whether the plaintiff made out a prima facie case where, as here, "the defendant has done everything that would be required [at step two],” I also proceed to step three of the McDonnell Douglas framework. United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

. Interviewers testified that they were familiar with women in other skilled trades at NYCHA such as plumbing, plastering, painting, and carpentry.

. This is in stark contrast to United States v. City of N.Y., 713 F.Supp.2d 300 (S.D.N.Y. 2010), on which the majority relies. In that pattern or practice case, as the district court’s opinion reflects, the New York City Department of Transportation ("DOT”) employed about 40 in-house bridge painters from 1996 to 2001. Id. at 306. No women were included among this number, and no women were hired as a result of three successful job postings during this period. Significantly, the district court opinion reflects both the number of men and women in each applicant pool and the qualifications of applicants. Id. at 311-14. Noting that the case had been litigated "without resort to statistical evidence other than ... the incontrovertible fact that DOT [had] never hired a provisional female Bridge Painter,” the district court suggested that in the circumstances, the absence of women was relevant, albeit perhaps only weakly so. Id. at 317-18. At any rate (and unlike here) "[r]e-gardless of the weight given to the total absence of female hires, the remaining anecdotal evidence,” the court concluded "was more than sufficient to show that DOT lacked consistent hiring standards ..., that less qualified men were given preferences over more qualified women, and that the disparate treatment was intentional appeasement of DOT’s existing all-male workforce.” Id. at 318.

. The majority does not even attempt to suggest that Walsh’s qualifications were equal to (much less superior than) any of the other four candidates.

. Walsh testified that Akugbe made this comment after informing her that NYCHA would not be offering her a position and saying that he was "sorry” and had been "rooting for [her].” J.A. 637. Akugbe denies telling Walsh either that he hoped she would be selected or that the interviewers were looking for someone stronger. J.A. 64.

. This conclusion is consistent with the approach of our sister circuits. See, e.g., Spokojny v. Hampton, 589 Fed.Appx. 774, 781 (6th Cir. 2014) (“[Plaintiff] cannot show that discrimination was a motivating factor by using a combination of remote, conclusory, isolated, unrelated, and ambiguous statements.”); Yue Yu v. McGrath, 597 Fed.Appx. 62, 67 (3d Cir. 2014) (“[E]mployee’s subjective belief in invidious nature of isolated and ambiguous comment does not support inference of discrimination.”) (citing Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1151 (10th Cir. 2008)); Hobgood v. Illinois Gaming Bd., 731 F.3d 635, 644 (7th Cir. 2013) (stating that "ambiguous or isolated comments that stand alone are insufficient" to survive summary judgment); Wagoner v. Pfizer, Inc., 391 Fed.Appx. 701, 708 (10th Cir. 2010) ("First, even at the summary judgment stage, ‘stray remarks,’ and 'isolated or ambiguous comments are too abstract ... to support a finding of age discrimination.’ ” (quoting Cone v. Longmont United Hosp. Ass’n, 14 F.3d 526, 531 (10th Cir. 1994))); Hein v. All Am. Plywood Co., 232 F.3d 482, 488 (6th Cir. 2000) (explaining that a plaintiff cannot establish a prima facie case based on "vague, ambiguous, or isolated remarks”).

. The majority invokes the film My Cousin Vinny in its discussion of the role of circumstantial evidence in Title VII cases. See Maj. Op. at 76-77 & n. 6. The film might more aptly be cited for the proposition that some individuals, such as Mona Lisa Vito, Vinny Gambini’s fiancée who gained expertise in automotives and auto mechanics working in her father's garage, are well qualified despite a lack of formal credentials. To avoid the possibility of creating disincentives to interview such people, courts might simply follow the Supreme Court's admonition that they should not "treat discrimination differently from other ultimate questions of fact.” Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 524, 113. S.Ct. 2742, 125 L.Ed.2d 407 (1993)).